**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

)
CARE NET PREGNANCY CENTER OF   )
WINDHAM COUNTY,                )
                               )
         Plaintiff,            )
                               )
    v.                         )        Civil Action No. 11-2082 (RBW)
                               )
UNITED STATES DEPARTMENT OF    )
AGRICULTURE, and               )
                               )
THOMAS J. VILSACK,             )
Secretary of the United States Department )
of Agriculture,                )
                               )
         Defendants.           )
_____)

## <u>MEMORANDUM OPINION</u>

The plaintiff, Care Net Pregnancy Center of Windham County ("Care Net"), brings this

action against the United States Department of Agriculture ("USDA") and its Secretary, Thomas

J. Vilsack, appealing a decision of the USDA which allegedly denied Care Net "eligibility to

obtain a government sponsored loan solely on the basis of [its] desire to engage in religious

speech."  Verified Complaint ("Compl.") at 1.  Currently before the Court are the defendants'

motion to dismiss, or in the alternative, for partial summary judgment; Care Net's cross-motion

for summary judgment; and the defendants' motion for summary judgment.  Upon careful

consideration of the parties' submissions,[1] the Court concludes for the following reasons that it

---

[1] In addition to the filings already identified, the Court considered the following submissions in rendering its decision: the Defendants' Memorandum in Support of their Motion to Dismiss, or in the Alternative, for Partial Summary Judgment ("Defs.' Mot. to Dismiss Mem."); Care Net's Opposition to Motion to Dismiss and Cross Motion for Summary Judgment ("Pl.'s Mem."); the Defendants' Reply Memorandum in Support of their Motion to Dismiss, or in the Alternative, for Partial Summary Judgment, in Opposition to Plaintiff's Motion for Summary Judgment, and in Support of Defendants' Motion for Summary Judgment ("Defs.' MSJ Mem."); Care Net's Consolidated Brief in Reply to its Motion for Summary Judgment and in Opposition to Defendants' Motion for

(continued . . .)

must grant in part and deny in part the defendants' motion to dismiss, or in the alternative, for

partial summary judgment; grant in part and deny in part without prejudice the defendants'

motion for summary judgment; deny without prejudice Care Net's cross-motion for summary

judgment; and remand this case to the USDA's National Appeals Division for further

consideration.

# I.  BACKGROUND

## A.      Statutory and Regulatory Framework

### 1.      The USDA's Community Facilities Loan Program

The USDA's Community Facilities Loan Program ("Loan Program") makes and

guarantees loans in rural areas with less than 20,000 people.  See generally 7 C.F.R. §§ 1942.1-

1942.50 (2012).  "[N]ot-for-profit" private organizations are among the entities eligible for the

Loan Program.  Id. § 1942.17(b)(1)(ii).  Loans may be used for "water or waste disposal" as well

as "other essential community facilities providing essential service primarily to rural residents

and rural businesses."  Id. § 1942.17(d)(1)(i).  "Essential community facilities are those public

improvements requisite to the beneficial and orderly development of a community operated on a

nonprofit basis," including, among other things, "[h]ealth services," and "[c]ommunity, social, or

cultural services."  Id. § 1942.17(d)(1)(i)(B).

In determining an applicant's eligibility for the Loan Program, the USDA may conduct a

"preapplication" review.  See id. §§ 1942.2(a), 1942.17(c)(2).  "This process entails a

preliminary review of certain materials to determine whether the applicant may be eligible, and

is intended to avoid unnecessary expenditures by applicants whose ineligibility can be

---

(. . . continued)
Summary Judgment ("Pl.'s Opp'n"); Defendants' Reply Memorandum in Support of their Motion for Summary
Judgment ("Defs.' MSJ Reply"); and the Administrative Record ("A.R.").

determined at an early stage."  Defs.' MSJ Mem. at 2.  Applicants who successfully complete the

preapplication stage must then submit a final application for funding.  See 7 C.F.R. § 1942.2(c).

"If at any time prior to loan approval it is decided that favorable action will not be taken

on a preapplication or application, the [USDA] will notify the applicant in writing of the reasons

why the request was not favorably considered," and of the process for administrative review.  Id.

§ 1942.2(d).  Administrative appeals of "adverse decisions" under the Loan Program are

governed by the procedures set forth at "7 C.F.R. part 11."  Id. § 1900.53.  Under this regulation,

USDA "program participants shall seek review of an adverse decision before a Hearing Officer"

of the USDA's National Appeals Division ("Appeals Division") "prior to seeking judicial

review."  Id. § 11.2(b) (emphasis added); see also 7 U.S.C. § 6912(e) ("Notwithstanding any

other provision of law, a person shall exhaust all administrative appeal procedures established by

the Secretary [of the USDA] or required by law before the person may bring an action in a court

of competent jurisdiction against—(1) the Secretary; (2) the [USDA]; or (3) an agency, office,

officer, or employee of the [USDA]." (emphasis added)).  If the Hearing Officer issues an

adverse decision, the program participant "may seek further review by the Director [of the

Appeals Division] . . . prior to seeking judicial review," but is not required to do so.  7 C.F.R. §

11.2(b) (emphasis added).

> ### 2.    Regulations Governing the USDA's Funding of Faith-Based Organizations

The USDA implemented regulations in 2004 setting forth "USDA policy regarding equal

opportunity for religious organizations to participate in USDA assistance programs for which

other private organizations are eligible." 7 C.F.R. § 16.1(a).  These regulations provide that

> [a] religious organization is eligible, on the same basis as any other eligible
> private organization, to access and participate in USDA assistance programs.
> Neither the Federal government nor a State or local government receiving USDA
> assistance shall, in the selection of service providers, discriminate for or against a

religious organization on the basis of the organization's religious character or affiliation.

Id. § 16.2(a).  The regulations further state that "[a] religious organization that participates in USDA assistance programs will retain its independence and may continue to carry out its mission, including the definition, practice, and expression of its religious beliefs."  Id. § 16.2(b).

The USDA's regulations do, however, impose limitations on funding provided to religious organizations.  To begin with, "[a] religious organization" may "not use USDA direct assistance to support any inherently religious activities, such as worship, religious instruction, or proselytization."  Id.  Moreover,

> [o]rganizations that receive direct USDA assistance under any USDA program may not engage in inherently religious activities, such as worship, religious instruction, or proselytization, as part of the programs or services supported with direct USDA assistance.  If an organization conducts such activities, the activities must be offered separately, in time or location, from the programs or services supported with direct assistance from USDA, and participation must be voluntary for beneficiaries of the programs or services supported with such direct assistance.

Id. § 16.3(b).  The USDA regulations also contain specific provisions governing the use of funds for building acquisition, construction, and rehabilitation by religious organizations:

> Direct USDA assistance may be used for the acquisition, construction, or rehabilitation of structures only to the extent that those structures are used for conducting USDA programs and activities and only to the extent authorized by the applicable program statutes and regulations.  Direct USDA assistance may not be used for the acquisition, construction, or rehabilitation of structures to the extent that those structures are used by the USDA funding recipients for inherently religious activities.  Where a structure is used for both eligible and inherently religious activities, direct USDA assistance may not exceed the cost of those portions of the acquisition, construction, or rehabilitation that are attributable to eligible activities in accordance with the cost accounting requirements applicable to USDA funds.  Sanctuaries, chapels, or other rooms that an organization receiving direct assistance from USDA uses as its principal place of worship, however, are ineligible for USDA-funded improvements.

Id. § 16.3(d)(1).

**B.**      **Factual and Procedural Background**

The following facts are undisputed.  Care Net is "a small non-profit organization which operates a pregnancy resource center in Brattleboro, Vermont, where it provides classes and services to both pre-natal and post-natal women in need."  Compl. ¶ 1.  It is a self-described "Christ Centered ministry that offers information, referrals and hope to young women (and men) who find themselves involved in an unplanned pregnancy," with the goal of "inspir[ing its] clients to make healthy life style decisions that directly affect the future[.]"  A.R. at 000117. Care Net seeks to "minister[] to women, men and families in the same way that Christ ministers."  Id.  Its services include pregnancy tests, education, counseling, parenting classes, and baby supplies.  Id.  The organization "does not perform, recommend or refer for abortion." Id.

On December 13, 2010, Care Net's Executive Director, Elizabeth Chechile, wrote a letter to the USDA's Rural Development Center "to inquire about [the] Community Facility [Loan] Program."  Id. at 000102.  Ms. Chechile explained that Care Net was "attempting to purchase a property of [its] own" in Brattleboro, Vermont, to use as a permanent facility, and expressed interest in obtaining a USDA loan to help finance the purchase and renovation of the property. Id.  The building that Care Net was considering purchasing "require[d] extensive work to bring it up to code and functionality," which was estimated to cost "about $100,000."  Id.  Along with her letter, Ms. Chechile enclosed copies of Care Net's brochure, its bylaws, articles of association, and related documentation.  Id.

Care Net's brochure made clear that the organization provided both secular and religious services.  For instance, it stated that Care Net's "Learn to Earn" program "rewards a pregnant client (and her partner) with baby and mommy care necessities for participating in a series of

classes to help prepare them for motherhood (and fatherhood)," and that clients "participate[] in a parenting class and a Bible study." Id. at 000117. The "Post Abortive Teaching and Healing" program was described as "a bible centered program" designed to "enable[] women to process their abortion-related experiences and emotions with the goal of healing and recovery." Id. And the "Why Am I Tempted?" training "encourages people of all ages to build healthy relationships by saving sex for marriage." Id.

Following a conversation with a representative from the USDA Rural Development Center, Ms. Chechile sent the USDA another letter, on January 14, 2011, providing further explanation of Care Net's programs. See id. at 000103. Regarding the Learn to Earn program, Ms. Chechile stated that Care Net "sometimes will adjust the program slightly to fit [its clients] needs," e.g., by "substitut[ing] some extra Parenting Classes in for some of the Bible Study Classes." Id. Apart from these "slight adjustments," however, Care Net generally adhered to its programs' requirements. Id. Ms. Chechile added that although "[t]he Learn to Earn Program [was] by far [Care Net's] most popular," it was "not [its] only focus." Id.

On January 14, 2011, representatives from Care Net and the USDA Rural Development Center held a meeting. See id. at 000159. The USDA representative stated that in light of USDA's "faith-based regulations," and given Care Net's desire to hold religious classes in the building for which it sought federal funding, its loan request would have to be "cleared for eligibility before proceeding." Id. The USDA Rural Development Center thus sought guidance from the USDA Office of General Counsel on whether the USDA's faith-based regulations precluded Care Net's eligibility for participation in the Loan Program. See id. at 000099-000100.

In a memorandum dated May 5, 2011, the USDA Office of General Counsel concluded that providing a loan to Care Net for the purpose of purchasing and renovating the facility raised "significant Constitutional issues," and that Care Net consequently was "not eligible to participate" in the Loan Program. Id. at 000098.  In reaching this conclusion, the Office of General Counsel determined that providing the loan to Care Net would violate the Establishment Clause of the First Amendment because "religious education [would] be conducted in the building that [would] be renovated with [Loan Program] funds," and because the "project would require extensive monitoring to ensure that Care Net . . . was using the renovated building for a secular purpose," resulting in an "excessive government entanglement with religion." Id. at 000097-000098.  The USDA Rural Development Center then informed Ms. Chechile, by letter dated May 16, 2011, that "Care Net . . . was not found eligible to participate in the Community Facility [Loan] Program." Id. at 000088.  The letter explained that "[t]he Faith-Based Eligibility Factors could not be met, based on Constitutional issues with potential excessive governmental entanglement with religion." Id.

After learning of the USDA's adverse determination, Ms. Chechile informed the USDA Rural Development Center on June 13, 2011, that Care Net changed the rules for the Learn to Earn program by not requiring Bible study classes, and by eliminating the rewards given to individuals who participated in such classes. See id. at 000156.  Then, during a telephone conversation on June 14, 2011, a USDA representative told Ms. Chechile that Care Net "could be eligible for the [Loan P]rogram . . . if they moved any religious education to a separate location" from the building that would be purchased and renovated with federal funds. Id. at 000154; see also id. at 000228-000229.  Ms. Chechile, however, did not believe that moving

Care Net's religious education programs to a separate location "would be an option." Id. at 000154.

Care Net then administratively appealed the USDA's May 16, 2011 denial letter to the Appeals Division, id. at 000015-000025, alleging that the "Establishment Clause . . . does not preclude Care Net from participating in USDA programs," id. at 000017, and that "[t]he agency's actions constitute a violation of Care Net's constitutional rights under the First Amendment, the Equal Protection Clause, and the Due Process Clause," id. at 000018-000019.

A hearing was held on the matter on July 21, 2011.  See id. at 000056.  During the hearing, Care Net confirmed that it intended to offer both religious and secular services in the same spaces in its proposed facility.  See Transcript of NAD Hearing, July 21, 2011 ("Hr'g Tr.") at 165:1-3 [ECF No. 14-3] ("We have a room, and it's being used for secular activities and it's being used for religious activities[.]"); see also A.R. at 000228 (Affidavit of Ms. Chechile) ("Bible classes will be offered in the same spaces that pregnancy and parenting classes are offered in.").

On September 26, 2011, the Hearing Officer issued an Appeal Determination upholding the USDA's decision finding Care Net ineligible for participation in the Loan Program.  See A.R. at 000065-000071.  In contrast to the May 16, 2011 denial letter, the Hearing Officer based his decision not on "Constitutional issues" associated with providing a federal loan to Care Net, but on Care Net's failure to satisfy "the faith-based eligibility" requirements of the USDA regulations.  Id. at 000066.  Specifically, he found that because "the proposed structure will be used for both eligible and inherently religious activities," and because the USDA regulations prohibited the agency from providing "direct program assistance to fund the portion of the building that [Care Net] intend[ed] to use for the ineligible purposes," the USDA "was correct to

determine it [could not] use direct program assistance to fund the complete acquisition and

renovation of the proposed structure as requested by" Care Net.  Id. at 000070.  He further

concluded that Care Net had "not satisfactorily shown that the amount of direct USDA assistance

requested does not exceed the cost of the proposed acquisition and renovation attributable to

eligible program activities."  Id.  In light of these conclusions, the Hearing Officer deemed it

unnecessary to address "the question of whether the [USDA] can use direct . . . assistance to fund

the proposed structure if participation in inherently religious activities conducted at the facility

are mandatory for beneficiaries."  Id.

　　　Care Net then instituted this action challenging the USDA's decision on November 22,

2011.  Its complaint sets forth eight counts.  Count I asserts that the defendants misapplied 7

C.F.R. § 16(d)(1) in finding Care Net ineligible for participation in the Loan Program, and

appears to be brought pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 702

(2006).  See Compl. ¶¶ 4, 34-58.  Count II asserts a violation of Care Net's First Amendment

right to engage in religious speech.  See id. ¶¶ 59-67.  Count III asserts a violation of the

Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb (2006).  See id. ¶¶ 68-74.

Count IV asserts a violation of Care Net's right to free exercise of religion under the First

Amendment.  See id. ¶¶ 75-81.  Count V asserts a violation of Care Net's right to due process

under the Fifth Amendment.  See id. ¶¶ 82-95.  Count VI asserts a violation of Care Net's right

to equal protection under the Fifth Amendment.  See id. ¶¶ 96-109.  Count VII asserts that the

USDA's denial of a loan on the basis of religious speech violated the Fair Housing Act, 42

U.S.C. § 3605 (2006).  See id. ¶¶ 110-115.  And Count VIII asserts that the USDA's denial of a

loan on the basis of religious speech violated the Equal Credit Opportunity Act ("Credit Act"),

15 U.S.C. § 1691 (2006).  See id. ¶¶ 116-120.

The defendants have now filed a motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(5), and 12(b)(6), or in the alternative, for partial summary judgment, as well as a separate motion for summary judgment. Care Net has filed a cross-motion for summary judgment.

## II.  STANDARDS OF REVIEW

### A.     Rule 12(b)(1) Motion to Dismiss

When a defendant moves for dismissal under Rule 12(b)(1), "the plaintiff[] bear[s] the burden of proving by a preponderance of the evidence that the Court has subject matter jurisdiction." Biton v. Palestinian Interim Self-Gov't Auth., 310 F. Supp. 2d 172, 176 (D.D.C. 2004); see Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992). A court considering a Rule 12(b)(1) motion must "assume the truth of all material factual allegations in the complaint and 'construe the complaint liberally, granting [a] plaintiff the benefit of all inferences that can be derived from the facts alleged.'" Am. Nat'l Ins. Co. v. FDIC, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (quoting Thomas v. Principi, 394 F.3d 970, 972 (D.C. Cir. 2005)). However, "the district court may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction." Jerome Stevens Pharm., Inc. v. FDA, 402 F.3d 1249, 1253 (D.C. Cir. 2005) (citing Herbert v. Nat'l Acad. of Scis., 974 F.2d 192, 197 (D.C. Cir. 1992)).

### B.     Rule 12(b)(6) Motion to Dismiss

A Rule 12(b)(6) motion tests whether the complaint "state[s] a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the

plaintiff pleads factual content that allows the court to draw [a] reasonable inference that the

defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556).  While

the Court must "assume [the] veracity" of any "well-pleaded factual allegations" in the

complaint, conclusory allegations "are not entitled to the assumption of truth."  Id. at 679.

## C.      Summary Judgment in an APA Case

"Summary judgment is the proper mechanism for deciding, as a matter of law, whether

an agency action is supported by the administrative record and consistent with the APA standard

of review."  Loma Linda Univ. Med. Ctr. v. Sebelius, 684 F. Supp. 2d 42, 52 (D.D.C. 2010)

(citing Stuttering Found. of Am. v. Springer, 498 F. Supp. 2d 203, 207 (D.D.C.2007)); see also

Richards v. INS, 554 F.2d 1173, 1177, 1177 n.28 (D.C. Cir. 1977).  But due to the limited role of

a court in reviewing the administrative record, the typical summary judgment standards set forth

in Rule 56(c) are not applicable.  Stuttering, 498 F. Supp. 2d at 207.  Rather, "[u]nder the APA, it

is the role of the agency to resolve factual issues to arrive at a decision that is supported by the

administrative record, whereas 'the function of the district court is to determine whether or not as

a matter of law the evidence in the administrative record permitted the agency to make the

decision it did.'"  Id. (quoting Occidental Eng'g Co. v. INS, 753 F.2d 766, 769 (9th Cir. 1985)).

In other words, "when a party seeks review of agency action under the APA, the district judge

sits as an appellate tribunal," and "[t]he 'entire case' on review is a question of law." Am.

Bioscience, Inc. v. Thompson, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (footnote and citations

omitted).

The APA provides a "default standard" of judicial review of agency actions when a

statute does not otherwise provide one: "A court must set aside agency action it finds to be

'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"  Tourus

Records, Inc. v. DEA, 259 F.3d 731, 736, 736 n.10 (D.C. Cir. 2001) (quoting 5 U.S.C. §

706(2)(A)). "The 'arbitrary and capricious' standard of review as set forth in the APA is highly

deferential," and the Court must therefore "presume the validity of agency action." Am. Horse

Prot. Ass'n v. Yeutter, 917 F.2d 594, 596 (D.C. Cir. 1990).  Although the "court is not to

substitute its judgment for that of the agency[,] . . . the agency must examine the relevant data

and articulate a satisfactory explanation for its action[,] including a rational connection between

the facts found and the choice made." Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.

Co., 463 U.S. 29, 43 (1983) (citations and quotation marks omitted).

### III.  ANALYSIS

#### A.      Standing

Although the defendants initially moved to dismiss Care Net's claims for injunctive and

declaratory relief for lack of standing, see Defs.' Mot. to Dismiss Mem. at 24-26, they now

concede that Care Net has met its burden to demonstrate Article III standing, Defs.' MSJ Mem.

at 13.  Nevertheless, because "[t]he federal courts are under an independent obligation to

examine their own jurisdiction," and because "standing 'is perhaps the most important of [the

jurisdictional] doctrines,'" FW/PBS, Inc. v. City of Dallas, 493 U.S. 215, 231 (1990) (quoting

Allen v. Wright, 468 U.S. 737, 750 (1984)), the Court must assess whether Care Net possesses

Article III standing.

"'The irreducible constitutional minimum of standing contains three elements: (1) injury-

in-fact, (2) causation, and (3) redressability.'" Nat'l Ass'n of Home Builders v. EPA, 667 F.3d

6, 11 (D.C. Cir. 2011) (quoting Ass'n of Flight Attendants-CWA v. U.S. Dep't of Transp., 564

F.3d 462, 464 (D.C. Cir. 2009)).  "'Thus, to establish standing, a litigant must demonstrate a

'personal injury fairly traceable to the [opposing party's] allegedly unlawful conduct and likely

to be redressed by the requested relief.'" Id. (citation omitted).  And "[t]o establish

organizational standing, [Care Net] must 'allege[] such a personal stake in the outcome of the

controversy as to warrant the invocation of federal-court jurisdiction'; that is, it must

demonstrate that it has 'suffered injury in fact, including [s]uch concrete and demonstrable injury

to the organization's activities—with [a] consequent drain on the organization's resources—

constitut[ing] . . . more than simply a setback to the organization's abstract social interests.'" Id.

(quoting Nat'l Taxpayers Union, Inc. v. United States, 68 F.3d 1428, 1433 (D.C. Cir. 1995)).

    Care Net claims that it has been "individually harmed" by the USDA's decision denying

it eligibility for the Loan Program, and it "seeks declaratory and injunctive relief for the benefit

of its own current and future [loan] applications to [the] USDA."  Pl.'s Mem. at 5 & n.5.  It has

submitted an affidavit from Ms. Chechile stating that if "the Court order[s the USDA] to allow

Care Net to apply for participation in the [Loan Program] on the same basis as non-religious

applicants, Care Net intends and is likely to apply for assistance from the [Loan Program] for the

Birge Street property, if it is still available, or for another property in Brattleboro, [Vermont,] if

the Birge Street property is no longer available."  Pl.'s Mem., Exhibit ("Ex.") C (Affidavit of

Elizabeth Chechile) ¶ 22.

    The Court finds Care Net's allegations sufficient to demonstrate a "personal stake" in the

outcome of this case that is "fairly traceable" to the USDA's decision denying Care Net's

eligibility for the Loan Program.  Indeed, if the USDA's decision stands, Care Net will either

have to change the way it administers its services or remain ineligible to apply for the Loan

Program.  A favorable decision from this Court, moreover, would redress Care Net's injury by

removing the initial barrier precluding its eligibility for participation in the Loan Program, thus

allowing Care Net to apply for USDA assistance for a property in Brattleboro that it intends to

use as its permanent facility.  Thus, the Court agrees with the parties that Care Net has standing

to pursue its claims for injunctive and declaratory relief.

**B.      Conceded Arguments**

The defendants raised several arguments in their briefs that Care Net has either implicitly

or expressly conceded.  First, Care Net does not dispute the defendants' arguments that sovereign

immunity bars all of Care Net's damages claims, except those asserted under the Credit Act, and

that Care Net has failed to state a procedural due process claim.  See generally Pl.'s Mem; Pl.'s

Opp'n.  The defendants' motion to dismiss these claims is therefore granted as conceded.  See

Lewis v. District of Columbia, No. 10-5275, 2011 WL 321711, at *1 (D.C. Cir. Feb. 2, 2011)

(per curiam) ("'It is well understood in this Circuit that when a plaintiff files an opposition to a

dispositive motion and addresses only certain arguments raised by the defendant, a court may

treat those arguments that the plaintiff failed to address as conceded.'") (quoting Hopkins v.

Women's Div., Gen. Bd. of Global Ministries, 284 F. Supp. 2d 15, 25 (D.D.C. 2003), aff'd 98 F.

App'x 8 (D.C. Cir. 2004)).  Second, Care Net expressly concedes that it is not pursuing any

claims against Secretary Vilsack in his individual capacity, see Pl.'s Mem. at 9-10, so the

defendants' motion to dismiss is granted as to the Secretary on this ground as well.

**C.      Exhaustion**

The defendants move for dismissal or partial summary judgment as to Care Net's claims

under the RFRA, the Free Exercise Clause of the First Amendment, the Credit Act, and the

substantive component of the Due Process Clause of the Fifth Amendment on the ground that

Care Net failed to exhaust its administrative remedies as to these claims.  See Defs.' Mot. to

Dismiss Mem. at 9.

Under the exhaustion doctrine, "'[a] party must first raise an issue with an agency before seeking judicial review.'"  <u>Tesoro Ref. & Mktg. Co. v. FERC</u>, 552 F.3d 868, 872 (D.C. Cir. 2009) (citation omitted).  "Broadly speaking, the doctrine of exhaustion of administrative remedies 'serves the twin purposes of protecting administrative agency authority and promoting judicial efficiency.'"  <u>Ass'n of Flight Attendants-CWA v. Chao</u>, 493 F.3d 155, 158 (D.C. Cir. 2007) (quoting <u>McCarthy v. Madigan</u>, 503 U.S. 140, 145 (1992)).  It "ensures that agencies— and not the federal courts—take primary responsibility for implementing the regulatory programs assigned by Congress."  <u>Id.</u>  "'Where Congress specifically mandates, exhaustion is required.  But where Congress has not clearly required exhaustion, sound judicial discretion governs.'"  <u>EEOC v. Lutheran Soc. Servs.</u>, 186 F.3d 959, 963 (D.C. Cir. 1999) (quoting <u>McCarthy</u>, 503 U.S. at 144).

Care Net's claims in this case are subject to the statutory exhaustion requirement of 7 U.S.C. § 6912(e), which provides that:

> Notwithstanding any other provision of law, a person shall exhaust all administrative appeal procedures established by the Secretary [of the USDA] or required by law before the person may bring an action in a court of competent jurisdiction against—
>
> (1) the Secretary;
>
> (2) the [USDA]; or
>
> (3) an agency, office, officer, or employee of the [USDA].

<u>See also</u> <u>Munsell v. USDA</u>, 509 F.3d 572, 581 (D.C. Cir. 2007) (holding that "§ 6912(e) establishes a mandatory, but nonjurisdictional, exhaustion requirement.").  Pursuant to this statutory provision, the USDA has implemented regulations directing that "program participants <u>shall</u> seek review of an adverse decision before a Hearing Officer of the [Appeals] Division . . . prior to seeking judicial review."  7 C.F.R. § 11.2(b) (emphasis added).

As the defendants point out, <u>see</u> Defs.' Mot. to Dismiss Mem. at 11-12, two circuit courts of appeals have imposed a requirement of "issue exhaustion" (i.e., that administrative remedies be exhausted specifically as to each issue) in proceedings before the Appeals Division, <u>see</u> <u>Ballanger v. Johanns</u>, 495 F.3d 866, 868-871 (8th Cir. 2007); <u>Mahon v. USDA</u>, 485 F.3d 1247, 1254-57 (11th Cir. 2007).  In so holding, the Eighth and Eleventh Circuits invoked the reasoning of <u>Sims v. Apfel</u>, 530 U.S. 103 (2000), where the Supreme Court explained:

> [R]equirements of administrative issue exhaustion are largely creatures of statute [or regulation]. . . . [However,] we have imposed an issue-exhaustion requirement even in the absence of a statute or regulation. . . . The basis for a judicially imposed issue-exhaustion requirement is an analogy to the rule that appellate courts will not consider arguments not raised before trial courts. . . . [C]ourts require administrative issue exhaustion as a general rule because it is usually appropriate under an agency's practice for contestants in an adversary proceeding before it to develop fully all issues there.  But, . . . the desirability of a court imposing a requirement of issue exhaustion depends on the degree to which the analogy to normal adversarial litigation applies in a particular administrative proceeding.  Where the parties are expected to develop the issues in an adversarial administrative proceeding, it seems to us that the rationale for requiring issue exhaustion is at its greatest. . . . Where, by contrast, an administrative proceeding is not adversarial, we think the reasons for a court to require issue exhaustion are much weaker.

<u>Id.</u> at 107-109 (internal citations, quotation marks, and alterations omitted).  Applying <u>Sims</u>, both circuits found that, although the USDA regulations do not expressly require issue exhaustion, "[t]he regulations that describe the hearings and review process before the USDA strongly suggest that the review process is adversarial and that issue exhaustion should be required." <u>Ballanger</u>, 495 F.3d at 869; <u>accord</u> <u>Mahon</u>, 485 F.3d at 1256 (The Appeals Division's "procedures provide an adversarial system in which parties are given a full and fair opportunity to make their arguments and present evidence, and, as a corollary, to attempt to challenge the arguments and evidence presented by the [USDA].  As such, the adversarial nature of the administrative proceedings counsel against allowing [the plaintiffs] to raise new arguments that

were not raised during the course of their administrative appeal or during the Director Review

phase.").  Because this Court finds the reasoning of <u>Ballanger</u> and <u>Mahon</u> persuasive, and given

that Care Net challenges neither the soundness of those decisions nor the defendants' reliance on

them, <u>see generally</u> Pl.'s Mem.; Pl.'s Opp'n, the Court likewise deems it appropriate to impose

an issue exhaustion requirement in this case.  Accordingly, Care Net will be precluded from

raising any issue before this Court that it failed to raise before the Appeals Division.

In Care Net's initial appeal to the Appeals Division, it asserted that the "Establishment

Clause . . . does not preclude Care Net from participating in USDA programs," A.R. at 000017,

and that "[t]he agency's actions constitute a violation of Care Net's constitutional rights under

the First Amendment, the Equal Protection Clause, and the Due Process Clause," <u>id.</u> at 000018-

000019.  Care Net then filed a "Memorandum of Law regarding why the Agency's decision is

contrary to its own regulations, the Constitution and the Fair Housing Act."  <u>Id.</u> at 000213.  This

memorandum argued that (1) the USDA "[f]ailed to [f]ollow its [o]wn regulations," <u>id.</u> at

000216-000218; (2) the USDA's Loan Program "[d]oes [n]ot [v]iolate the Establishment

Clause," <u>id.</u> at 000218-000223; (3) the "[d]enial of a [l]oan to Care Net [b]ased on the [r]eligious

[n]ature of Care Net's [s]peech is a [v]iolation of the Free Speech Clause of the First

Amendment," <u>id.</u> at 000223-000224; (4) the "[d]enial of a [l]oan to Care Net [w]hile [g]ranting

[l]oans to [o]ther [s]ubstantially [s]imilar [o]rganizations is a [v]iolation of Care Net's [e]qual

[p]rotection [r]ights," <u>id.</u> at 000224-000225; and (5) the "[d]enial of a [l]oan to Care Net to

[r]enovate [t]heir [s]helter [b]ecause of the Bible [c]lasses [t]hat [m]ay [t]ake [p]lace in the

[s]ame [b]uilding is a violation of the [Fair] Housing Act," <u>id.</u> at 000225.  When the parties

appeared before the Hearing Officer for a prehearing conference, Care Net did indicate that it

intended to argue at the upcoming hearing that the USDA's actions violated the Free Exercise

Clause.  See Transcript of NAD Prehearing Conference, June 30, 2011 [ECF No. 14-2] at 17:13-22; 18:16-19:4; 20:5-16.  However, at the hearing, Care Net maintained that the USDA's decision was "wrong for six reasons"—none of which entailed the Free Exercise Clause.  See Hr'g Tr. at 27:13-28:2 (arguing that the USDA's decision (1) was "not required by the Establishment Clause"; (2) was "contrary to the Free Speech Clause"; (3) violated "the Fair Housing Act"; (4) violated "the Equal Protection Clause"; (5) was "contrary to the [USDA]'s own regulations"; and (6) misapplied a USDA regulation "to a loan application when that regulation only applies to applications for  grants").  Thus, Care Net never explicitly advanced claims under the RFRA, the Free Exercise Clause, the Credit Act, or the substantive component of the Due Process Clause during the administrative proceedings before the Appeals Division.

To be sure, the Circuit has recognized that "exhaustion may be excused" in some situations, namely, "if delaying judicial review would cause irreparable injury, if the agency is not competent to address the issue or to grant effective relief, or if further pursuit of an administrative remedy would be futile."  Chao, 493 F.3d at 159.  But Care Net does not invoke any of these "'ordinary exceptions to exhaustion[.]'"  Tesoro Ref., 552 F.3d at 873 (citation omitted).  Instead, it opposes the defendants' exhaustion argument on four grounds, see Pl.'s Mem. at 6, none of which the Court finds persuasive.[2]

First, Care Net contends that exhaustion does not apply because "the Hearing Officer affirmed [the] USDA's decision on a basis different than that originally asserted by [the] USDA."  Id.  Care Net cites no case law or other authority in support of this novel, purported exception to the exhaustion doctrine.  Recognizing such an exception would, moreover, swallow the rule of requiring issue exhaustion in proceedings before the Appeals Division.  Indeed, given

---

[2] Because Care Net does not invoke any of the ordinary exceptions to exhaustion, the Court will not sua sponte consider the applicability of those exceptions on Care Net's behalf.

the adversarial nature of those proceedings, Care Net must be "held responsible for raising issues in a manner similar to litigants in court," Ballanger, 495 F.3d at 869 (citing Sims 530 U.S. at 108-111), meaning that Care Net was obligated to raise any deficiencies it perceived in the agency's action before the USDA, regardless of the particular grounds articulated in the agency's decisions. Allowing Care Net to raise new claims before this Court would also "undercut 'the purposes of exhaustion, namely, preventing premature interference with agency processes, . . . afford[ing] the parties and the courts the benefit of [the agency's] experience and expertise, . . . [or] compil[ing] a record which is adequate for judicial review.'" Hidalgo v. FBI, 344 F.3d 1256, 1259 (D.C. Cir. 2003) (citations omitted and some alterations in original).

Second, Care Net asserts that its "RFRA and [f]ree [e]xercise claims were argued, if not in name than in substance, before the [Appeals Division] Hearing Officer" because the "primary issue in a[] RFRA or a [f]ree [e]xercise claim—whether the Establishment Clause requires [the] USDA to deny Care Net [eligibility for the Loan Program]—was exhaustively argued to the Hearing Officer." Pl.'s Mem. at 6, 8. This argument rests on several flawed premises. To begin with, since issue exhaustion is required in administrative proceedings before the Appeals Division, Care Net had to raise more than just the "substance" of its RFRA and free exercise claims. It was instead obligated to "'forcefully present[]'" its argument before the Appeals Division, "or else waive the right to raise those arguments on appeal" before this Court. Vill. of Barrington, Ill. v. Surface Transp. Bd., 636 F.3d 650, 655 (D.C. Cir. 2011) (quoting Vt. Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 554 (1978)).[3] Care Net failed to do that. Rather,

---

[3] Although the foregoing quotation from Village of Barrington concerned the administrative waiver doctrine rather than the concept of issue exhaustion, the Circuit has recognized that "[t]he distinction between 'issue exhaustion' and 'issue waiver' is illusive, to say the least." Advocates for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin., 429 F.3d 1136, 1149 (D.C. Cir. 2005). "Indeed, both terms appear in the case law without apparent distinction, and they are sometimes treated as if synonymous." Id.

it stated in passing at the prehearing conference that it intended to raise a free exercise challenge

to the USDA's decision, but then neglected to raise the argument when it actually mattered—at

the hearing itself.  And regarding Care Net's position that it "substantially exhausted" its claims

under the RFRA and the Free Exercise Clause by presenting arguments to the Appeals Division

concerning the Establishment Clause, Pl.'s Mem. at 8, this position assumes that the resolution of

Care Net's RFRA and free exercise claims hinge solely on an Establishment Clause analysis.

Yet, irrespective of any Establishment Clause issues, Care Net had to "first establish that its free

exercise right ha[d] been substantially burdened" in order "[t]o sustain its claim under either the

Constitution or the [RFRA.]"  Branch Ministries v. Rossotti, 211 F.3d 137, 142 (D.C. Cir. 2000);

see RFRA, 42 U.S.C. § 2000bb-1(a), (b) ("Government shall not substantially burden a person's

exercise of religion even if the burden results from a rule of general applicability," unless the

government "demonstrates that application of the burden to the person—(1) is in furtherance of a

compelling governmental interest; and (2) is the least restrictive means of furthering that

compelling governmental interest.").  Although Care Net now argues that its religious rights

were substantially burdened because the USDA's decision forced Care Net "to choose between

offering Bible study classes at its proposed new facility or obtaining a loan from the [Loan

Program]," Pl.'s Mem. at 11, there is no indication that this argument was "forcefully presented"

(or presented at all, for that matter) to the Appeals Division.[4]  Nor did Care Net argue before the

Appeals Division, as it does now, that it need not "establish [a] substantial burden" on its free

exercise rights because the USDA's decision "is not neutral and generally applicable."  Pl.'s

---

[4] While Care Net does not dispute that it failed to raise its "substantial burden" argument before the Appeals Division, it appears to contend that the administrative record independently demonstrates the purported substantial burden on its free exercise rights imposed by the USDA's decision.  See Pl.'s Mem. at 8; Pl.'s Opp'n at 10.  But, regardless of what the record might support in hindsight, Care Net's failure to advance the argument before the Appeals Division is fatal to its position.

Opp'n at 13.  Consequently, Care Net is barred from raising its claims under the RFRA and the Free Exercise Clause for the first time before this Court.

Third, Care Net maintains that the RFRA does not require administrative exhaustion, Pl.'s Mem. at 9, relying on the Ninth Circuit's decision in Oklevueha Native American Church of Hawaii, Inc. v. Holder, 676 F.3d 829, 838 (9th Cir. 2012) ("declin[ing] to read an exhaustion requirement into RFRA where the statute contains no such condition, and the Supreme Court has not imposed one" (internal citation omitted)).  This argument also misses the mark.  Regardless of whether the RFRA requires exhaustion, parties challenging adverse decisions under the USDA's Loan Program are required by statute and regulation to exhaust their administrative remedies, see 7 U.S.C. § 6912(e); 7 C.F.R. § 11.2(b), and by judicial doctrine to exhaust all issues, including any RFRA claims, before the Appeals Division, see Sims 530 U.S. at 107-09; Ballanger, 495 F.3d at 869; Mahon, 485 F.3d at 1256.  Insofar as Oklevueha, 676 F.3d at 838, did not involve an administrative scheme mandating exhaustion, that case is distinguishable.

Finally, Care Net argues that its claim under the Credit Act also does "not require . . . exhaustion of administrative remedies."  Pl.'s Mem. at 9.  The defendants "agree . . . as a general matter" that administrative exhaustion of Credit Act claims is not required by statute or regulation, but contend that this Court should exercise its discretion to require exhaustion.  Defs.' MSJ Mem. at 16-17.  Care Net does not respond to this argument in its opposition brief, see generally Pl.'s Opp'n, so the Court will deem it conceded.  See Lewis, 2011 WL 321711, at *1 (citing Hopkins, 284 F. Supp. 2d at 25).

In sum, the Court concludes that Care Net failed to administratively exhaust its claims in regards to the RFRA, the Free Exercise Clause, and the substantive component of the Due Process Clause, and treats as conceded the defendants' argument urging dismissal of Care Net's

Credit Act claim.  Partial summary judgment on these issues is therefore granted in the

defendants' favor.[5]

## D.      Whether the Hearing Officer Misapplied the USDA's Regulations

Care Net claims that the Appeals Division's Hearing Officer erred in his interpretation of

7 C.F.R. § 16.3(d)(1), see Compl. ¶ 55, which provides in pertinent part:

> Direct USDA assistance may be used for the acquisition, construction, or
> rehabilitation of structures only to the extent that those structures are used for
> conducting USDA programs and activities and only to the extent authorized by
> the applicable program statutes and regulations.  Direct USDA assistance may not
> be used for the acquisition, construction, or rehabilitation of structures to the
> extent that those structures are used by the USDA funding recipients for
> inherently religious activities.  Where a structure is used for both eligible and
> inherently religious activities, direct USDA assistance may not exceed the cost of
> those portions of the acquisition, construction, or rehabilitation that are
> attributable to eligible activities in accordance with the cost accounting
> requirements applicable to USDA funds.

7 C.F.R. § 16.3(d)(1) (emphasis added).  In finding that the USDA's decision to deny Care Net

eligibility under the Loan Program was consistent with § 16.3(d)(1), the Hearing Officer

reasoned:

> 7 C.F.R. § 16.3(d)(1) confirms that where a structure is used for both eligible and
> inherently religious activities, direct USDA assistance may not exceed the cost of
> the acquisition and rehabilitation attributable to the eligible activities.  At the
> hearing, [Care Net] alleged it would incur no additional costs to acquire and
> renovate the building to accommodate the religious education classes.  [Care Net]
> therefore contends that all direct program assistance requested would be
> attributable to the acquisition and rehabilitation of the eligible activities only.  I
> am not persuaded by [Care Net's] argument.

---

[5] The Court grants the defendants' alternative request for partial summary judgment, as opposed to its motion to
dismiss, because it considered materials outside the pleadings—namely, the administrative record—in resolving the
defendants' exhaustion arguments.  See Fed. R. Civ. P. 12(d) ("If, on a motion under Rule 12(b)(6) . . . matters
outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary
judgment under Rule 56."); Marshall Cnty. Health Care Auth. v. Shalala, 988 F.2d 1221, 1226 & n.5 (D.C. Cir.
1993) (noting that a district court considering a Rule 12(b)(6) motion "can consult the [administrative] record to
answer the legal question[s] before the court," but that "[i]t is probably the better practice for a district court always
to convert to summary judgment" (emphasis added)).

[Care Net] requests direct program assistance to acquire and renovate a building it intends to use for both eligible and inherently religious activities.  Therefore, the acquisition and renovation costs attributable or associated with the eligible and inherently religious activities[] . . . must be prorated to ensure [the USDA] is not funding prohibited or ineligible purposes. . . .[6] [The USDA] can only fund the portion[] or percentage of the acquisition and rehabilitation costs attributable to the eligible activities.  [The USDA] must be able to realistically quantify or separate out, either in space or time, the inherently religious activities from the eligible, secular activities.  Due to the fluctuating nature of [Care Net's] program and due to a lack of reliable classroom information provided by [Care Net], [the USDA] is unable to realistically separate the eligible activities from the inherently religious activities either by time or space, thereby creating an excessive entanglement between Government and religion.  Therefore, I find [that the USDA] correctly determined [that Care Net] does not meet the faith-based eligibility factors outlined under § 16.3(d)(1), with a potential for excessive Government entanglement with religion.  [Care Net] has not satisfactorily shown that the amount of direct USDA assistance requested does not exceed the cost of the proposed acquisition and renovation attributable to eligible program activities.

A.R. at 000070 (paragraph break added).

Care Net raises the same arguments before this Court that the Hearing Officer rejected.

Namely, it asserts that while its "Bible classes are to take place in the same classrooms that the

non-religious pregnancy and parenting classes take place in[, n]o additional USDA funds and no

additional construction is made necessary by using the classrooms for voluntary Bible study

when the classrooms are not in use for pregnancy and parenting classes."  Pl.'s Mem. at 26.

Thus, according to Care Net, "a proper application of 7 C.F.R. § 16.3(d)(1) provides that [the]

entire acquisition and renovation cost [for the building] is eligible for a USDA loan as no

improvements are required to allow for non-eligible activities such as Bible study."  Id. at 26-27.

"An agency's interpretation of its own regulation is entitled to 'substantial deference,'

unless 'plainly erroneous or inconsistent with the regulation.'"  Devon Energy Corp. v.

---

[6] The Court has omitted a statistic referenced by the Hearing Officer purportedly showing the percentage of clients that visited Care Net for Bible classes.  The parties have stipulated to the inaccuracy of the statistic, see Stipulation [ECF No. 16], and the Hearing Officer, in any event, discounted it as unreliable, see A.R. at 000070.

Kempthorne, 551 F.3d 1030, 1036 (D.C. Cir. 2008) (quoting Thomas Jefferson Univ. v. Shalala,

512 U.S. 504, 512 (1994)).  This standard applies to the Appeals Division's interpretations of the

USDA's regulations.  See Clason v. Johanns, 438 F.3d 868, 871 (8th Cir. 2006); Lackey v.

USDA, 384 F. App'x 741, 747-748 (10th Cir. 2010).

      Here, Care Net has not shown that the Hearing Officer's interpretation of § 16.3(d)(1)

was plainly erroneous or inconsistent with the regulation.  The regulation states that "[w]here a

structure is used for both eligible and inherently religious activities, direct USDA assistance may

not exceed the cost of those portions of the acquisition, construction, or rehabilitation that are

attributable to eligible activities."  7 C.F.R. § 16.3(d)(1).  The Hearing Officer read this provision

to require that the "acquisition and renovation costs attributable or associated with the eligible

and inherently religious activities . . . be prorated to ensure [the USDA] is not funding prohibited

or ineligible purposes," given that the USDA "can only fund the portion[] or percentage of the

acquisition and rehabilitation costs attributable to the eligible activities."  A.R. at 000070

(emphasis added).  There is nothing unreasonable about this interpretation; indeed, how else is

the USDA supposed to determine what "portions" of mixed-used facilities (i.e., structures "used

for both eligible and inherently religious activities")  are "attributable to eligible activities," 7

C.F.R. § 16.3(d)(1), other than by requiring proration of eligible vs. ineligible uses?  Applying

this plausible reading of § 16.3(d)(1), the Hearing Officer found that "[d]ue to the fluctuating

nature of [Care Net's] program and due to a lack of reliable classroom information provided by

[Care Net]," the USDA was "unable to realistically separate the eligible activities from the

inherently religious activities either by time or space."  A.R. at 000070.  He therefore concluded

that Care Net failed to carry its burden of showing "that the amount of direct USDA assistance

requested [would] not exceed the cost of the proposed acquisition and renovation attributable to

eligible program activities." Id. (emphasis added).  Nothing in § 16.3(d)(1) "unambiguously

forecloses" this reading of the regulation, St. Marks Place Hous. Co. v. HUD, 610 F.3d 75, 83

(D.C. Cir. 2010), so the Court must defer to it.

Tellingly, Care Net does not explain why it believes the Hearing Officer's interpretation

of § 16.3(d)(1) was unreasonable.  See Pl.'s Mem. at 26-27.  It instead offers a competing

reading of the regulation: that the USDA may permissibly fund the entire project because no

additional improvements are required solely for Care Net's inherently religious activities (i.e.,

Bible classes).  See id.  Regardless of the soundness of this interpretation, it is by no means the

only reasonable reading of § 16.3(d)(1).  And considering the "substantial deference" to which

the Hearing Officer's interpretation is entitled, Care Net's challenge must be rejected.

Accordingly, summary judgment on this issue is granted in the defendants' favor.

**E.      Issues Not Addressed by the Appeals Division**

The parties expend the majority of their briefs submitted to this Court addressing

constitutional issues relating to the Establishment Clause, the Free Speech Clause, and the Equal

Protection Clause, as well as Care Net's statutory claims under the Fair Housing Act.  Although

these issues were litigated thoroughly before the Appeals Division, see, e.g., A.R. 000215-

000226; Hr'g Tr. at 27:13-28:2, the Hearing Officer, for reasons unbeknownst to the Court,

found it unnecessary to address them in his decision.  As he explained:

> At the hearing, both [Care Net] and [the USDA] presented arguments on the
> Constitutionality of the proposed loan and whether excessive entanglement with
> religion exists.  In making a determination in this case, I, as an [Appeals Division]
> Hearing Officer, am not bound by previous findings of fact on which the
> [USDA's] adverse decision was based.  My purpose is to ensure that the decision
> is consistent with the laws and regulations of the [USDA] and with the generally
> applicable interpretations of such laws and regulations.  Therefore, my
> determination will not address the Constitutional issues argued, but will be limited
> to whether [Care Net] satisfactorily meets the faith-based eligibility factors
> necessary to be eligible for the requested . . . loan.

A.R. at 000066 (emphasis added).

"[A]gencies . . . have 'an obligation to address properly presented constitutional claims which . . . do not challenge agency actions mandated by Congress.'" McBryde v. Comm. to Rev. Circuit Council Conduct, 264 F.3d 52, 62 (D.C. Cir. 2001) (quoting Graceba Total Comms., Inc. v. FCC, 115 F.3d 1038, 1042 (D.C. Cir. 1997)); see also Meredith Corp. v. FCC, 809 F.2d 863, 874 (D.C. Cir. 1987) ("Federal officials are not only bound by the Constitution, they must also take a specific oath to support and defend it. . . . [The FCC] must discharge its constitutional obligations by explicitly considering [the petitioner's] claim that the FCC's enforcement of the fairness doctrine against [the petitioner] deprives it of its constitutional rights. The [FCC's] failure to do so seems to us the very paradigm of arbitrary and capricious administrative action."). This rule "guard[s] against premature or unnecessary constitutional adjudication," and ensures that courts have the "benefit . . . [of] the [agency's] analysis." Meredith Corp., 809 F.2d at 872. Moreover, even when an argument is non-constitutional, an agency must respond to it so long as it "do[es] not appear frivolous on [its] face and could affect the [agency's] ultimate disposition." Frizelle v. Slater, 111 F.3d 172, 177 (D.C. Cir. 1997).

Applying these standards, the Court finds that the Appeals Division erred in ignoring: (1) Care Net's properly presented claims under the Free Speech and Equal Protection Clauses, which asserted as-applied challenges to the USDA's actions in this case; (2) the USDA's defense under the Establishment Clause, to the extent that resolution of that defense is potentially dispositive of any of Care Net's claims; and (3) Care Net's non-facially frivolous claim under the Fair Housing Act. Accordingly, this case must be remanded to the Appeals Division for further consideration. See Meredith Corp., 809 F.2d at 874 (remanding case to agency with instructions to consider the petitioner's previously unaddressed constitutional arguments); Iowa v. FCC, 218 F.3d 756, 760

(D.C. Cir. 2000) (agency's failure to address the petitioner's argument required remand for further consideration).

## IV.  CONCLUSION

For the foregoing reasons, the defendants' motion to dismiss, or in the alternative, for partial summary judgment is granted in part and denied in part; the defendants' motion for summary judgment is granted in part and denied in part without prejudice; Care Net's cross-motion for summary judgment is denied without prejudice; and this case is remanded to the Appeals Division for further consideration of the issues identified in this Memorandum Opinion.

**SO ORDERED** this 10th day of October 2012.[7]

REGGIE B. WALTON
United States District Judge

---

[7] The Court will contemporaneously issue an Order consistent with this Memorandum Opinion.